Ordronaux, Commissioner.
This is a proceeding analogous in its nature to the melius inquirendum of the common law, and is intended like it to determine the legal uncertainty which now arises as to the right of longer detaining the above-named lunatic in the custody of an asylum.
By the provisions of the statute of 1874 (chap. 446, as amended by chap. 267 of the Laws of 1876), the commissioner in lunacy is empowered to inquire into all cases where there is reason to believe that “any person is wrongfully deprived of his liberty, or is cruelly, negligently or improperly treated in any asylum, institution or establishment, public or private, for the *219 custody of the insane; or whenever there is inadequate provision made for their skillful medical care, proper supervision and safe keeping; and if the same shall be proved to his satisfaction, he is further empowered to issue an order in the name of the People of the State and under his official hand and seal, directed to the superintendent and managers of such institution, requiring them to modify such treatment or apply such remedy or both as shall therein be specified.”
It is plain that under this provision, the commissioner may inquire not only into the legality of the original commitment to an asylum but also into the legality of the continued detention of a patient therein. The reason is obvious. Persons afflicted with insanity may recover, and thus the right to deprive them of their liberty may cease to have any foundation in physical disease upon which to rest. The reason for detention thus ceasing, the right to detain disappears with it.
Now at common law, after office found against a lunatic, the crown might have a melius inquirendum to-be a supplement to a defect or uncertainty of a former office (Exp. Roberts, 3 Atkyns, 5; Viner's Abridgt. and verbum). It lies therefore wherever the first office wants certainty in divers points (The King v. Hethersal, 3 Mod. 80 ; The King v. Saloway, 3 Id. 100). Although the foregoing cases all arose subsequent to inquests in lunacy, and upon the findings of commissions, yet under the statute of 1874 it seems conclusive-that, so far as its effects upon the personal liberty of the lunatic are concerned, his commitment to an asylum under the forms prescribed by the commissioner in lunacy is tantamount to a commitment by a committee of his person appointed after office found. In fact we-have largely discarded that cumbrous form of procedure, reserving it alone to the lunatic who may feel himself aggrieved by the act of the court approving his commitment and so demand a trial of the issue by jury ; or *220 to a lunatic possessed of property and needing a committee of Ms estate (ch. 446 of 1874, Tit. 1, Art. 1, § 11; 2 R. S. 52).
By parity of reason, when any superintendent of an asylum has any reasonable doubt as to his right to detain a patient who, though legally committed, has so far recovered in appearance that the question of his •discharge can be entertained—it seems reasonable and proper that in such case he should apply to the commissioner, as the appropriate inquisitorial officer for a melius inquirendum to determine the doubt, and to decide whether such patient still continues a fit subject for confinement in an asylum. It is under this interpretation of the powers of the commissioner, that this proceeding is now instituted.
The facts in evidence show that the alleged lunatic having been legally adjudged a lunatic and a fit subject for detention in an asylum, pursuant to ch. 446, Laws of 1876, Art. ■ 1, § 1, was committed to the custody of A. B., the superintendent of a private asylum duly licensed, &c., on the 11th day of May, 1876. The medical certificates in his case were signed by two physicians : and the same were approved by a judge of the supreme court. The commitment was in every sense legal in its forms, and, as the evidence shows, rested upon a physical basis of well proved insanity.
Under these circumstances the right to restrain the lunatic of his liberty is a concomitant of the finding of insanity, and must be exercised by his custodians, by whatever name known, whenever he is shown to be dangerous to himself or to others. The effect of the above finding, so far as the personal liberty of the lunatic is concerned, is similar to that of an inquisition of lunacy, and he may accordingly be restrained so long as the reasons expressed in the statute for requiring his confinement continue. The evidence of Dr. Choate, his custodian, and of Dr. Brown, his consulting physician, *221 who has seen him at least five times within the past six months, shows that he is laboring under an incurable disease of the brain occasioning a form of paralysis, known as the general paralysis of the insane. That mental symptoms corresponding in violence and emphasis to those of his physical derangement, have accompanied his malady, now rising in intensity and again subsiding; that the general effects upon his mind of these repeated disorders of his nervous centers have been to lower and enfeeble its tone ; that following such nervous shocks he has intervals of quiescence during which his physical disease appears dormant, and his mind clear, though weak; but that these conditions depend upon absence of all excitement, such as he has enjoyed in the seclusion of the asylum. That in the month of October last, being taken to Hew York as an experiment to test his power of enduring travel and the excitement of visiting friends, he became at once excited, violent, and refractory to guidance, in so much that the police had to be summoned to coerce him. His power of self-control was thus only awakened by coercion, and he returned to the asylum much worse for the experiment thus made. The experts who have either had him in charge or seen him in consultation all agree in regarding his disease as incurable, and they also agree that he is a dangerous lunatic to control, owing to the habitually despotic exercise of his will, which renders Mm difficult of guidance and requires the presence of at least coercive measures to govern him.
A personal examination shows Mm to be a man of nervous, sanguine temperament, naturally ambitious and indefatigable, but now broken in both mental and physical vigor, and conscious of the great mental shocks which his brain disease has entailed upon Mm. He no longer believes he possesses Ms former business capacity, and is evidently even more conscious of his mental impairment than he is willing to admit. His physical *222 health under the regularity of asylum life, has improved as he says, and he admits that he could not safely be exposed to excitement, but insists that he could travel with a servant and companion ; and desires his release from the asylum for that purpose.
Other witnesses also represent him as a dangerous and violent lunatic when at large, and consider it unsafe to expose him to any excitement. He has made threats of injury to his family and in some instances endeavored to carry them into effect.
Under these circumstances it seems plain that there is no room for doubting how I should decide this inquiry.
A lunatic living on the borders of a mental volcano, which the least excitement or the ordinary friction of life might cause to explode, cannot be safely left to his own guidance. The law does not permit it, and humanity to him and to others alike forbids it. My judgment is, and I accordingly find, that he is still insane ; that he needs the protection and restraints of an asylum; and that he remains a fit subject for care and treatment according to the provisions of the statute, under which he is committed.
The lunatic was subsequently judicially declared to be such by the courts of Massachusetts where his legal domicil was.